COMMERCIAL CASUALTY INSURANCE COMPANY

*v.*

RICHARD H. MANSFIELD & a.

121

124.

*Devine & Millimet* (*Mr. Millimet* orally), for the plaintiff.

*Wyman, Starr, Booth, Wadleigh & Langdell* (*Mr. Booth* orally), for Fidelity and Casualty Insurance Company of New York.

*Frederic J. Grady, Hughes & Burns* and *Donald R. Bryant* (*Mr. Bryant* orally), for Walter and Dorothy T. Harding.

*Walter Pillsbury* for Richard H. Mansfield, filed no brief.

DUNCAN, J. I. *The Commercial Casualty Insurance Company policy.* The policy of insurance which was issued by the plaintiff to the defendant Mansfield was styled a "foreign automobile combination policy." While it was a single policy, it contained insuring agreements by the Firemen's Insurance Company of Newark, New Jersey, as well as the plaintiff company. It was countersigned at Washington, D. C. by American International Underwriters Cor-

poration as "Foreign Managers for Both Companies," and the declarations provided that notice of accident or loss should be given to the latter company. The insuring agreement specified the type of coverage afforded by each insuring company and expressly stated that the insurers agreed "severally but not jointly with the Insured." The declarations likewise indicated that coverage for liability for bodily injury and property damage was furnished by the plaintiff, and comprehensive, collision, and automobile marine coverages by the Firemen's Insurance Company.

The policy was forwarded to Mansfield in Japan on May 27, 1949. The policy period was April 23, 1949 to April 23, 1950, and the vehicle described in the policy was delivered to the port for shipment to Japan on May 9, 1949. Mansfield left the United States March 31, 1949.

Article X of the insuring agreements so far as material provided as follows: "This policy applies only to accidents which occur and to direct loss of and damage to the property insured which are sustained . . . while the automobile . . . is (1) within the geographical area specified in Item 7 of the Declarations, or (2) if the named insured's domicile on the effective date of the policy period is outside the United States of America . . . , while within the United States of America . . . for a period not exceeding thirty days during the policy period commencing with the date of the arrival of the named insured or of the automobile, whichever shall first occur." The geographical area specified, "in which this policy applies," was "Japan."

The Trial Court ruled that Mansfield's domicile has always been West Hampstead, New Hampshire, and that he was at no time domiciled outside the United States "so the thirty day grace period in the Commercial Casualty policy . . . did not apply to him." The Court further found and ruled, "The Insurance Company waived this territorial provision only insofar as the theft clause and collision clause was concerned; otherwise there was no waiver of the geographical limits of coverage, nor is the Insurance Company estopped to set up the territorial limits provision of the policy as a defense in this proceeding; nor is there any evidence that Mansfield relied upon any waiver of territorial limits of the policy, at least after receipt of the Long Beach office letter of January 31, 1950."

There was evidence, and the Court found, that by letter of January 31, 1950, Federal Services Finance Corporation, hereinafter called "Federal," notified Mansfield that "such overseas

policies are not good in the states," and that the policy should be returned for cancellation. The defendants Harding and the defendant Fidelity and Casualty Insurance Company of New York, hereinafter called "Fidelity," excepted to findings and rulings with respect to the plaintiff's policy and to the granting of certain of its requests, for findings and rulings.

These defendants now concede that the thirty day provision of article X of the insuring agreements did not apply, because Mansfield was at all material times domiciled in West Hampstead, New Hampshire. They agree that the Court correctly found that the geographical restrictions were waived by the payment of the claims for loss by theft at sea and for the damage caused to the automobile by collision with a hydrant at Derry, New Hampshire, on January 12, 1950. They assert, however, that the Court erroneously restricted the waiver to the theft and collision coverages, and argue that the waiver must be taken to have extended to liability coverages as well. It is pointed out that the accident of January 12, 1950, "involved a liability insurance claim as well as a collision claim." The argument is made that the waiver operated to keep the policy in effect until it was cancelled in March, 1950, and Fidelity argues further that the Court erred in ruling that there was no evidence "that Mansfield relied upon any waiver . . . at least after receipt of the . . . letter of January 31, 1950."

The plaintiff company takes the position that, regardless of the meaning of "domicile" as used in article X, Mansfield was entitled to the benefit of the thirty day grace period because he was overseas when the policy became effective; and that therefore there was no waiver of the geographical limitation on coverage, since the last loss paid under the policy occurred during the thirty days' grace.

Article X of the policy does not appear to us to be open to the construction urged by the plaintiff. The thirty day grace period, so-called, was provided for the purpose of permitting an insured residing outside the United States a limited period of coverage within the United States, sufficient to obtain domestic coverage if he desired to remain within the United States for more than thirty days. The grace period is made available to an insured whose "domicile on the effective date of the policy period is outside the United States." While Mansfield left this country prior to April 23, 1949, the evidence established that his domicile remained in the United States, and there was no evidence to indicate that he

acquired even a residence outside the United States. We are therefore of the opinion that by its terms the policy furnished no coverage to Mansfield within the United States.

It follows that the Trial Court correctly concluded that there was a waiver of the geographical limitation upon coverage, when Mansfield's loss at sea and his collision loss in January, 1950, were paid under the policy. These losses, apart from the geographical limitation, came within the coverages against theft and collision, which were the responsibility of the Firemen's Insurance Company. If there was a possibility of claim that the insured was liable for property damage by reason of the accident of January 12, 1950, there is no evidence that such a claim was made. The only settlements made under the policy came within coverages furnished by Firemen's Insurance Company. Whether the waiver which clearly occurred as to these coverages operated to require notice to the insured before the geographical limitation should again be restored is unimportant, because no further claim was made under these particular coverages before cancellation of the policy.

The vital question is whether the payments presumably made by Firemen's Insurance Company also operated as a waiver by the plaintiff either because American International Underwriters Corporation participated and was also the plaintiff's agent, or because the plaintiff chose to join with Firemen's Insurance Company in issuing a single policy to the insured.

There is little or no evidence to show participation by the plaintiff in the settlement of the claims made under the policy. Mansfield testified at one point that his first claim, for the loss at sea, was made to American International Underwriters Corporation. Again he testified that he sent notice of this loss "to the Commercial Casualty or the other company, the American Underwriters." With respect to the collision of January 12, 1950, he testified, "I sent the whole business, as I remember, to the Commercial Casualty, or American Underwriters, I don't remember who." He finally conceded that "it was the Firemen's that [he] made this claim to for damage to [his] own car on January twelfth."

If this testimony might be taken as some evidence of notice to the plaintiff of a loss or losses claimed to have been covered by the policy, the record contains no evidence that the plaintiff in any way participated in settlement of the claims or that it had any actual knowledge that the claims were settled. Any acts or knowledge on the part of American International Underwriters

Corporation as agent for Firemen's Insurance Company, were limited to the business of the latter there being no evidence to the contrary. 1 Mechem, Agency, s. 184. The American Corporation was under no duty to notify the plaintiff of a claim insured against by Firemen's. Hence there is no reason to hold the plaintiff bound by the agent's knowledge of the disposition of such a claim. "The application of this rule is limited by the reasons that sustain it." *Clark* v. *Marshall,* 62 N. H. 498, 500. See also, *Warren* v. *Hayes,* 74 N. H. 355, 357; *Dearborn* v. *Fuller,* 79 N. H. 217. To hold the plaintiff liable upon any presumption of "duty on the part of the agent to communicate . . . knowledge" (*Clark* v. *Marshall, supra* 500) which did not concern the plaintiff "would impose an unreasonable and unjust burden upon the employer." *Dearborn* v. *Fuller, supra,* 218.

As previously stated, the policy provided that the undertakings of the insuring companies were several but not joint, and the evidence furnishes no reason to disregard the terms of the policy. While no authorities involving combination policies have been brought to our attention, the case of *Waen* v. *Ohio Farmers Ins. Co.,* 4 Cal. App. (2d) 513, 514, involved such a policy. The court there observed that "while the policies were embodied in one instrument, the portions thereof relating to the respective liability assumed by each of the two insurers were kept separate and distinct," and finding no ambiguity in the policy, enforced it according to its terms.

Under our decisions a waiver is a voluntary relinquishment of known rights (*Therrien* v. *Maryland Cas. Co.,* 97 N. H. 180), and the doctrine of estoppel requires reliance upon conduct of the party to be estopped. See *McCracken* v. *Insurance Company,* 94 N. H. 474; *Duval* v. *Company,* 82 N. H. 543, 546. The record before us affords no evidence applicable to the plaintiff upon which either waiver or estoppel could be predicated. Neither is it open to the defendants to claim that the plaintiff should be estopped to deny coverage because of retention of any premium for the period after January 17, 1950, the effective date of cancellation of the policy. *Cf. National Liberty Ins. Co.* v. *Milligan,* 10 F. (2d) 483, 485. Prior to that date and thereafter until actual cancellation, the policy remained in effect subject to the express limitations contained therein, including the geographical limitation of article X.

The finding of the Trial Court, "nor is there any evidence that Mansfield relied upon any waiver of territorial limits of the policy,

at least after receipt of the . . . letter of January 31, 1950," was not strictly accurate. Mansfield testified that he first gave notice to the plaintiff of the accident of February 14 in which Dorothy Harding was injured, and his testimony indicated that even after receipt of the letter of January 31, 1950, he was not satisfied that his coverage under the combination policy was ineffective, because he had in fact received payments under the policy for losses suffered outside of Japan.

There was however no evidence that the events upon which he claims to have relied in assuming that the policy was or might be effective in the United States were in any way chargeable to the plaintiff, or resulted from any action in its behalf or waiver on its part. The error in the finding therefore cannot be deemed prejudicial. We conclude that the action of the Trial Court with respect to the policy to which the plaintiff was a party was free from prejudicial error.

II. *The policy issued by Fidelity and Casualty Insurance Company of New York.* We turn now to consideration of the policy issued by the defendant Fidelity and Casualty Insurance Company for a policy period from February 15, 1950, to February 15, 1951. This policy the Trial Court ruled was effective on February 14, 1950, by virtue of the letter of that date written to Mansfield by the California representative of Federal Services Finance Corporation. In this connection the Court further found and ruled: "Under the facts of this case the Federal Services Finance Corporation is found to be the agent of the Fidelity and Casualty Insurance Company for the purpose of issuing binders. The Federal had both apparent and express authority to bind Fidelity and Casualty." To these and other pertinent findings and rulings Fidelity excepted.

The evidence established that Federal was licensed under the laws of the District of Columbia as a broker, and also as an agent for Stuyvesant Insurance Company, but as agent for no other companies. Federal's dealings with Fidelity were wholly between the former's Washington office and the insurance office of A. Melville Cox in Washington. Cox was a licensed policy-writing agent for Fidelity, with express written authority to accept proposals for insurance on behalf of Fidelity. Federal had no authority express, implied, or apparent unless it arose out of its dealings with Cox.

Any evidence to support the finding and ruling that "express" authority was granted to Federal must be found in the correspon-

dence between Federal and Cox, and in the testimony of the manager of Federal's Washington office. Cox was not a witness. It appeared that in April, 1948, Federal established arrangements with Cox for the writing of insurance by him, at which time he assured Federal in writing merely that "on all acceptable automobile . . . insurance" Federal would be allowed a commission of twenty per cent. Thereafter, as the Court found: "Federal customarily ordered policies from Cox effective the day the customer asked for the insurance. If he [the customer] wrote for the liability insurance, the policy was ordinarily ordered to be effective the date the letter was postmarked. If the insurance was in connection with a new finance contract the insurance was written effective the day the contract was signed. In every instance, the policy period was stated in the policy as Federal had ordered it. Cox never refused in a single instance to make the policy period as Federal had ordered it. Federal gave Cox all of its domestic liability insurance business. . . . It was the understanding of Federal with Cox that the insurance was to become effective on the date ordered from Federal by an assured even though Federal's order to Cox for the insurance was not received until later. There was usually a lapse of several days between the time that the insurance was ordered from Federal and the time that Federal submitted the order to Cox." In addition to the foregoing findings, which were supported by the evidence, the Court also found and ruled as follows: "It was the custom of Federal to give oral binders to its insureds upon their placing their order for insurance. No written binder form was used. Cox knew that Federal was issuing binders and approved and authorized the practice. . . . Between the time the insurance was ordered from Federal and the time that the policy was written, the binder was in effect. The letter of Cox to Federal of February 15, 1949, confirmed the arrangement that had been made between Federal and the Cox Agency."

The letter of February 15, 1949, advised the Federal manager "with reference to your requests for binding coverage," that "our Companies have instructed us to limit these binders to a period of ten days." (Italics supplied). The manager testified, however, that in a telephone conversation on February 21, 1949, Cox agreed that binders would be held for twenty days "once ordered," and as shown by a memorandum made by the witness, agreed that all insurance would be effective "from date ordered from us [Federal] or when papers signed." There was also in evidence a letter from

Cox to Federal under date of February 20, 1950, (three days after the Mansfield application was received by Cox) stating that his agency had been severely criticized for issuing policies effective five to thirty days prior to receipt of applications, and that in the future "all policies . . . ordered by your office cannot be put in force prior to the date the applications are mailed *by* you." (Italics supplied).

On this evidence, the question is whether it could properly be found that Cox expressly authorized Federal to commit the defendant to an insurance risk at the time application was made to Federal; or whether the evidence merely establishes a practice by which Cox issued insurance when requested to do so, as of a date represented to be the date of the customer's application to Federal, thus placing the latter in a position to assure its customers that insurance would be so issued.

We are unable to agree that the evidence went beyond the last stated proposition. The correspondence relied upon relates entirely to Federal's "requests for binding coverage," not to its authority, to issue such coverage; to company instructions to Cox "to limit these binders" (February 15, 1949); and to the effective dates of "policies . . . ordered" by Federal (February 20, 1950). There is no indication here of any grant of authority to Federal to place insurance, either by binders or policies. The memorandum by Federal's manager with respect to her conversation with Cox on February 21, 1950, is no broader: *"They'll* hold all binders *once ordered* for twenty days . . . all new insurance effective from date ordered from us or when papers signed." (Italics supplied). This was interpreted by the witness who wrote it to mean that Cox would " 'write the policy as of the date we said the customer asked it to be written, or when the papers are signed.' " This is not evidence of authority on the part of Federal to make insurance effective at any time; but only of a representation by Fidelity's agent as to when he would make it effective.

No claim is made, nor was there any evidence, that Cox at any time authorized Federal to assure its customers that insurance was immediately effective when applications were made to Federal. If Fidelity is bound by any practice or knowledge on the part of Cox, the only practice or knowledge shown was that of backdating policies at Federal's request. Fidelity concedes that it was bound where this was done. It is significant that under date of March 9, 1950, Federal's Washington manager wrote to Cox requesting

him to have "the date of the policy changed to afford coverage for this accident," with no ·suggestion that such coverage had been effected by any act of Federal. The findings that Federal had express authority to issue binders, and that Cox knew that it was doing so and approved and authorized the practice are unsupported by the evidence.

The evidence relied upon to establish "apparent" authority on the part of Federal furnishes no better support for the findings made. In *Davison* v. *Parks,* 79 N. H. 262, 263, it was pointed out that in order to bind a principal by an act which an agent is not expressly authorized to do, it must appear that "the principal has either so conducted his business as to give third parties a right to believe that the act in question is one he has authorized his a'gent to do, or that it is one agents in that line of business are accustomed to do." See also, *Sullivan* v. *Insurance Co.,* 86 N. H. 184; *Great Am. Ind. Co.* v. *Richard,* 90 N. H. 148; *Grange Mut. Fire Ins. Co.* v. *Commons,* 146 F. (2d) 788. Federal did not hold itself out as an agent of Fidelity, and there is no evidence from which it could be found that Mansfield was given to understand that Federal had any authority to bind Fidelity by any insurance contract. See *Kobilsek* v. *Indemnity Company,* 95 N. H. 324, 328. Mechem, Outlines of Agency (4th *ed.*) s. 94. Mansfield had never had a policy issued by Fidelity, had no reason to expect that the policy about which Federal wrote him on February 14, 1950,·would be issued by Fidelity, and no knowledge of any existing practice between Federal and Cox. His experience with Federal had been limited solely to the combination policy issued in May, 1949, which was not intended to take immediate effect. *Cf. Federal Insurance Co.* v. *Sydeman,* 82 N. H. 482, 485.

On the question of the manner in which brokers are accustomed to do business, the manager of Federal's Washington office was permitted, over objection, to testify that, "we always had to have an understanding" that "we did definitely have binding power"; but her further explanation made it plain that in the case of policies which could not be written by Federal as an agent for Stuyvesant Insurance Company, the insurance would be ordered from a policy-writing agent with a request that the policy be made effective as of a specified date. Thus, in dealing with the Cox Agency, as the Court found, the date of application by the customer to Federal would be furnished, and Cox would procure· a policy effective as of that date. In one or more instances policies were so written by

Cox although losses occurred between the dates of application to Federal, and the dates of acceptance by Cox.

With respect to the custom generally, Federal's manager testified that issuing companies make a practice of giving "the person procuring business a certain leeway . . . and they naturally tell the customer that he is covered from the day he actually orders the policy." Her opinion was that the business could not be operated without such an understanding.

In our judgment this testimony did not warrant the conclusion that brokers are accustomed to issue binders, oral or otherwise, which operate to make insurance effective immediately. The issue was not what brokers customarily told their customers, but what they were customarily authorized to tell them. At most the testimony appears "to be merely the expression of an incorrect opinion. . . . " *Hartline* v. *Mut. Ben. H. & A. Ass'n.*, 96 F. (2d) 174, 176. "The customary practice of one agent or insurer is not enough to show a general practice . among agents." *Hartford &c. Co.* v. *Lougee,* 89 N. H. 222, 227. The law is settled that oral contracts of insurance may be made by agencies authorized to place insurance, and that such contracts are binding if the terms can be ascertained. *Elliott* v. *Insurance Co.*, 92 N. H. 505, 510. Soliciting agents may have authority to place insurance, express or apparent. See *Hartford &c. Co.* v. *Lougee, supra,* 89 N. H. 222. But it is equally well settled that brokers do not customarily represent the insurer in negotiating insurance, although they may in particular cases. *McCabe* v. *Company,* 90 N. H. 80. The reason is obvious. Insurance companies could hardly conduct their business upon any intelligent basis if every broker wherever doing business, could bind any company it chose, to insure against any risk, pending such time as an application could be passed upon by the company. Such are not "the normal powers of a familiar position." Mechem, Outlines of Agency, *supra, s.* 93.

The testimony of the Federal manager went no further than to establish a practice by which Cox, whose authority to give oral binders was undisputed, consistently issued policies which were made effective as of the date requested by Federal. This was not evidence that Federal bound the insurer by what may have been told the customer, or that any insurance was in effect before the order was placed with Cox and he established the effective date. *Strangio* v. *Consolidated Indemnity & Ins. Co.,* 66 F. (2d) 330; *American Casualty Co. of Reading, Pa.* v. *Ricas,* 22 A. (2d) 484.

"The [company] is not answerable for what [Federal] did in excess of [its] rightful authority merely because of [its] pretense of authority not in fact bestowed upon [it]." *Hartford &c. Co.* v. *Lougee, supra,* 89 N. H. 222, 226. Cox could issue a binder placing insurance in effect retroactively and consistently did so at Federal's request; but the practice did not establish that Federal could enter into a contract of insurance as of the time an order was placed with it. *Matter of Mearian,* 266 N. Y. 625.

Even if the evidence could be thought to support findings that Federal had apparent authority to issue binders because Cox, acting for the company, knowingly permitted it to do so, or "so far represented [Fidelity] as to estop it by his knowledge of a false statement" (*Hartline* v. *Mutual Benefit Health & Accident Ass'n,* 96 F. (2d) 174, 176), the evidence in our opinion fails to support the finding of the Trial Court that Federal did in fact issue a binder, and the decree must be set aside for this reason. The letter of Federal's California manager to Mansfield under date of February 14, 1950, did not state that the desired insurance was presently in effect: "We have . . . requested our Home Office to issue a . . . policy and we will forward this to you as soon as it is received." The Court's finding and ruling was: "This was a binder issued by him to Mansfield"; and the Court emphasized the statement that the writer had requested the insurance to be written "not that he was going to request it to be written." The letter nevertheless fell short of indicating that any insurance had been written, but on the contrary stated not that Federal's California representative was himself providing coverage but that he had written to Washington, D. C. to have a policy issued there. "The issuance of a binder . . . is, so to speak, an interim insurance contract." *Red Cab Co.* v. *St. Paul Mercury Ind. Co.,* 98 F. (2d) 189, 191, *cert. den.* 305 U. S. 646. It is "present insurance, like a policy." 3 Richards on Insurance (5th *ed.*) s. 387. It "must show an intention of the parties to make such a contract effective *in praesenti.*" *Zurich Accident Ins. Co.* v. *Baum,* 159 Va. 404, 412.

The statement in the letter of February 14, 1950, held to be a binder, is in distinct contrast with the assurance given by the agent in *Koivisto* v. *Bankers & Merchants Fire Ins. Co.,* 148 Minn. 255, relied on by the defendants Harding. There the customer was told that the insurance was in force as of the date of his application. Reliance was also placed by the Court upon the fact that the policy was dated back to the time of the transaction with the agent, and

a premium paid to the principal for the period before issue, during which the accident occurred. *Cf.* also, *National Liberty Ins. Co.* v. *Milligan*, 10 F. (2d) 483, 485, and cases cited; *Barrette* v. *Company*, 79 N. H. 59. The decision is square authority for the proposition that Cox could bind his company, but differs materially from what occurred in this case between Federal and Mansfield. No assurance was given Mansfield by Federal that he was presently insured. See *K. C. Working Co.* v. *Eureka-Sec. Ins. Co.*, 82 Cal. App. (2d) 120. He was merely notified that a distant branch office had been requested to issue a policy. Moreover in the case before us the agent with binding authority (Cox) was asked to issue a policy effective February 15, and did so, and no premium was sought or paid for any period which included the day of the accident.

The instant case is stronger for the insurer than was *Sheridan* v. *Mass. Fire & Marine Ins. Co.*, 233 Mass. 479, where it appeared that a broker Crowley had repeatedly assured the plaintiff that he was insured, pending issue of a new policy. The comments of the Court in entering judgment upon a directed verdict for the defendant, are in point: "The undisputed evidence shows that [Crowley] was an insurance broker, and as such solicited the plaintiff's application and obtained from the defendant's agent the policy which was issued. This did not constitute him the agent of the defendant . . . The evidence would not warrant a finding that Crowley had any express or implied authority whatever to act for the defendant. As an insurance broker he could solicit insurance and forward applications to the defendant, but he was not in any sense its agent." *Ib.*, 480, 481.

Furthermore there is no evidence that Mansfield understood that any immediately effective insurance was issued. When the accident occurred, he notified Commercial Casualty Insurance Company. Not until February 24 did he notify Federal, and then not as his insurer, but rather to request that a policy yet to be issued be "backdated to February 14 at least."

We conclude that the Court erred (1) in finding that the letter of February 14, 1950, was a binder, in the sense that it operated to place any insurance in effect, and (2) in ruling that Federal had authority both express and apparent to bind Fidelity. No insurance was in effect until the application was accepted by Cox, who had authority to place the insurance in force. No insurance became effective before February 15, 1950.

It follows that it was likewise error to decree reformation of the policy so as to include February 14, 1950, in the policy period. No right to reformation on the ground of mistake could properly be held to have arisen, because there was no evidence of fraud or mutual mistake. If a mistake was made by Federal in requesting a policy effective February 15, 1950, it was a unilateral mistake, affording no ground for reformation. *Carignan* v. *Company*, 95 N. H. 262, 265, and authorities cited; *Parrette* v. *Citizens Casualty Co.*, 126 N. J. Eq. 327.

Declaratory judgments consistent with this opinion should be entered in favor of both the plaintiff, and the defendant Fidelity and Casualty Company of New York.

*Case discharged.*

BLANDIN and LAMPRON, J. J., dissented believing the evidence warranted the Trial Court's decree and would affirm it; the others concurred.