Northland Insurance v. NH Insurance   CV-95-434-B   02/26/99   P

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>**Northland Insurance Co.**</u>

        **v.**                                    Civil No. 95-434-B

<u>**New Hampshire Insurance Co.;**</u>
<u>**Textile Trucking of**</u>
<u>**New Hampshire, Inc., et al.**</u>

<u>**MEMORANDUM AND ORDER**</u>

New Hampshire Insurance Co. and Northland Insurance Co. issued successive commercial automobile insurance policies on behalf of Textile Trucking of New Hampshire, Inc.  Following a collision between one of Textile Trucking's vehicles and a bicyclist, Textile made demands on both insurers for a defense and indemnification against any liability resulting from the collision.  In response, Northland brought this declaratory judgment action, pursuant to 28 U.S.C.A. § 1332 (West 1993) and 28 U.S.C.A. §§ 2201 and 2202 (West 1994), seeking a determination as to which insurer, if either, owes coverage to Textile Trucking and the employee who was driving the vehicle involved in the

collision. Northland, New Hampshire Insurance, and Textile Trucking have each filed cross motions for summary judgment.

## I. BACKGROUND

Textile Trucking transports raw wool in interstate commerce. In 1993 and 1994, it operated pursuant to a permit issued by the Interstate Commerce Commission ("ICC").[1]

Textile Trucking applied to New Hampshire Insurance in August 1993, seeking commercial automobile insurance to cover its fleet of trucks. It also requested that New Hampshire Insurance provide any liability coverage required by state and federal law and file certificates of insurance with the ICC and state regulators in Massachusetts, New Hampshire and New Jersey.

New Hampshire Insurance issued Textile Trucking an insurance policy valid from August 31, 1993, until August 31, 1994. The policy covered five Textile Trucking vehicles, including the 1985 Mack truck involved in the collision that gave rise to the current dispute. Attached to the policy was a cancellation and

---

[1] In December 1995, Congress transferred the ICC's responsibilities to the Department of Transportation and the newly created Surface Transportation Board. ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995) (codified as amended in scattered sections of 49 U.S.C.A.).

non-renewal endorsement that had the effect of automatically renewing the policy upon its expiration unless New Hampshire Insurance took certain actions.  To prevent renewal, New Hampshire Insurance had to provide Textile Trucking with notice of non-renewal sixty days prior to the policy's expiration, except where, *inter alia*: (1) New Hampshire Insurance manifested a "willingness to renew"; (2) New Hampshire Insurance refused to renew "due to [Textile Trucking's] non-payment of premium"; or (3) Textile Trucking failed to pay "any advance premium required by [New Hampshire Insurance] for . . . renewal."

When New Hampshire Insurance issued the insurance policy, it also filed (1) a Form BMC 91X Certificate of Insurance with the ICC; and (2) Uniform Motor Carrier Bodily Injury and Property Damage Liability Certificates of Insurance ("Form E Certificates") with regulatory authorities in Massachusetts, New Hampshire and New Jersey.  A Form BMC 91X Certificate states that a motor carrier's liability insurance policy has been amended by the attachment of a Form MCS 90 Endorsement.  A Form E Certificate states that the policy has been amended by the attachment of a Uniform Motor Carrier Bodily Injury and Property Damage Liability Insurance Endorsement ("Form F" Endorsement).

3

Both the Form MCS 90 Endorsement and the Form F Endorsement are subject to special cancellation requirements that operate independently of the policy's cancellation provisions.

New Hampshire Insurance canceled its policy with Textile Trucking several times during the course of the 1993-94 policy period because of the company's alleged failure to make timely premium payments. When New Hampshire Insurance cancels a policy for non-payment of premiums, it typically also cancels all federal and state filings made on behalf of the insured. If the policy is later reinstated, the company reinstates the federal and state filings. In this case, while New Hampshire Insurance reinstated the ICC and New Jersey filings each time it reinstated the policy, it canceled, but did not reinstate, the Massachusetts and New Hampshire filings.

In June 1994, New Hampshire Insurance sent Textile Trucking two non-renewal notices, advising the company of its willingness to renew the policy upon payment of a specified premium. The non-renewal notices, however, required Textile Trucking to remit the specified premium payment by August 31, 1994, in order to maintain its coverage.

Textile Trucking alleges that after it received the non-renewal notices, an employee of its insurance broker, Elliot

Agency, informed the company that it had a thirty-day "grace period" between the renewal payment "due date" and the date that coverage would actually expire. Textile Trucking's belief that it was entitled to a thirty-day grace period was reinforced, the company claims, by New Hampshire Insurance's practice of routinely providing policyholders a second notice of cancellation and an additional thirty days after the first premium due date in which to pay the premium. Claiming that it relied on the Elliot Agency's representations and New Hampshire Insurance's practice in other cases, Textile Trucking did not make the required premium payment by the August 31, 1994 deadline specified in the non-renewal notices.

On September 15, 1994, Textile Trucking used the Elliot Agency to obtain a commercial automobile insurance policy from Northland. This policy provided coverage retroactively from September 1, 1994, to September 1, 1995. The policy covered four Textile Trucking vehicles, but not the vehicle involved in the accident. Pursuant to Textile Trucking's request, Northland also filed a form BMC 91X Certificate of Insurance with the ICC. The ICC received the certificate on September 21, 1994, several hours after the accident.

Textile Trucking claims that the September 1, 1994 start date specified in the Northland policy was a mistake because the company instructed its broker that it did not want coverage to begin until October 1, 1994. It also asserts that it did not seek coverage from Northland for the vehicle involved in the accident because its broker led it to believe that the vehicle would be covered under the New Hampshire Insurance policy until September 30, 1994, when Textile Trucking intended to remove the vehicle from service.

On September 21, 1994, a Mack truck driven by a Textile Trucking employee, Mark Kaar, collided with a bicyclist in Charlestown, Massachusetts. The bicyclist suffered serious injuries and brought suit against Textile Trucking and Kaar. Textile Trucking and Kaar made demands for a defense and indemnification on both New Hampshire Insurance and Northland. Northland then brought this declaratory judgment action to determine which insurer, if either, owes coverage to Textile Trucking and Kaar.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file,

6

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Lehman v. Prudential Ins. Co. of America, 74 F.3d 323, 327 (1st Cir. 1996). A "genuine" issue is one "that properly can be resolved only by a finder of fact because [it] . . . may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A "material" fact is one that "affect[s] the outcome of the suit." Id. at 248. In ruling on a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. See Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988).

Where the nonmoving party bears the burden of persuasion at trial, it must "make a showing sufficient to establish the existence of [the] element[s] essential to [its] case" in order to avoid summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). It is not sufficient for the non-moving party to "rest upon mere allegation[s] or denials [contained in that party's] pleading." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson, 477 U.S. at 256). Rather, to establish a trial-worthy issue, there must be enough competent

7

evidence "to enable a finding favorable to the nonmoving party."
Id. at 842 (internal citations omitted).  Where the moving party
bears the burden of persuasion at trial, the movant must also
support its position with materials of evidentiary quality.  See
Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 763 n.1 (1st
Cir. 1994).  Further, "[the] showing must be sufficient for the
court to hold that no reasonable trier of fact could find other
than for the moving party."  Lopez v. Corporacion Azucarera de
Puerto Rico, 938 F.2d 1510, 1516 (1st Cir. 1991).

## III.  **DISCUSSION**

The parties seek to determine whether either New Hampshire
Insurance or Northland owes Textile Trucking and Kaar any
coverage for liability that may result from the underlying
lawsuit.  Each insurer denies that it is liable to Textile
Trucking and claims that to the extent that any coverage is owed,
the other insurer bears responsibility for providing it.
Conversely, Textile Trucking asserts that both insurers owe it
some measure of coverage.  I address each insurer's coverage
obligations in turn under its policy, the filings it made with
the ICC and any filings it made with state authorities.

## A.   New Hampshire Insurance's Coverage Obligations

### 1.   The Policy

Textile Trucking concedes that it did not renew the New Hampshire Insurance policy by making the required premium payment on or before the date specified in the insurer's non-renewal notices.  Nevertheless, it argues that New Hampshire Insurance was obligated to continue coverage for a 30-day "grace period" after the date specified in the notices because its agents made certain statements and the insurer took actions which reasonably led the company to believe that it was entitled to the grace period.  This argument is best understood as an equitable estoppel claim.[2]

Equitable estoppel is a doctrine that "forbid[s] one to speak against his own act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon."  Great Lakes Aircraft Co. v. City of Claremont, 135 N.H. 270, 290 (1992).  In other words, a "wrongdoer may be

_____

[2]  On March 5, 1998, I issued an order rejecting Textile Trucking's claim that the non-renewal notices were deficient because they failed to comply with the requirements of the policy's non-renewal endorsement.  See Northland Insurance Co. v. New Hampshire Insurance Co., et al., Civil Action No. 95-434-B (March 5, 1998).  Textile Trucking's failure to make the premium payment called for in the notices thus caused the policy to expire on August 31, 1994 unless the company can succeed with its equitable estoppel claim.

estopped from making assertions, even if true, which are contrary to acts and representations previously made." Id. Thus, as Textile Trucking asserts, an insurer can be estopped from applying the terms of a contract to deny an insured coverage in light of the insurer's prior representations and actions to the contrary. See Olszak v. Peerless Ins. Co., 119 N.H. 686, 690-91 (1979); Great Lakes Aircraft Co., 135 N.H. at 290.

The four essential elements of equitable estoppel are: (1) a representation of material facts made by a party with knowledge of their falsity; (2) ignorance of the truth of the matter on the part of the party to whom the representation was made; (3) the intention on the part of the first party that the second party should act upon the representation; and (4) the detrimental reliance of the second party on the representation. See Hawthorne Trust v. Maine Sav. Bank, 136 N.H. 533, 538 (1992). The party asserting a claim of equitable estoppel has the burden of proof as to each of these elements. See Healey v. Town of New Durham Zoning Bd. of Adjustment, 140 N.H. 232, 240 (1995).

Textile Trucking's equitable estoppel claim fails because it has not produced sufficient evidence to support its claim that New Hampshire Insurance or one of its agents made the misrepresentations on which the claim is based. Although it

10

points to evidence of statements allegedly made by employees of the Elliot Agency that might reasonably have caused the company to believe that it could claim the benefit of a 30-day grace period, it cannot prove that the employees were acting as agents of New Hampshire Insurance when they made the statements. See generally North River Ins. Co. v. Cy Thompson Trans. Agency, 840 F.2d 139, 142 n.3 (1st Cir. 1988); Mutual Benefit Life Ins. Co. v. Gruette, 129 N.H. 317, 322 (1987); Commercial Cas. Ins. Co. v. Mansfield, 98 N.H. 120, 133 (1953). Nor can it prove that New Hampshire Insurance routinely gave other insureds the benefit of a 30-day grace period. Without such evidence, the company cannot demonstrate that its actions were the result of any acts or statements attributable to New Hampshire Insurance. Accordingly, it cannot avoid summary judgment by claiming equitable estoppel.

## 2.   Federal Filings

Textile Trucking and Northland next argue that New Hampshire Insurance owes the company coverage pursuant to the MCS 90 Endorsement even if the policy to which the endorsement was attached expired prior to the accident. The company bases this argument on New Hampshire Insurance's alleged failure to comply with the endorsement's special cancellation rules. I analyze this contention by first discussing the federal statutes and

11

regulations that required Textile Trucking to purchase the coverage provided pursuant to the MCS 90 Endorsement.

(a) Filing Requirements

When New Hampshire Insurance insured Textile Trucking, the Motor Carrier Act of 1980, 49 U.S.C.A. § 10927 (West 1994)[3] required any interstate motor carrier operating pursuant to a permit issued by the ICC to file proof of liability insurance "sufficient to pay . . . for each final judgment against the carrier for bodily injury to, or death of, an individual resulting from the negligent operation . . . of [its] motor vehicles." Id. § 10927(a)(1). The legislative purpose underlying the proof of insurance requirement was "to ensure that an ICC carrier has independent financial responsibility to pay for losses sustained by the general public arising out of its trucking operations." Travelers Ins. Co. v. Transport Ins. Co., 787 F.2d 1133, 1139 (7th Cir. 1986).

The Act also authorized the United States Department of Transportation ("DOT") and the ICC to promulgate regulations to further the Act's purpose. See 49 U.S.C.A. § 10321(a) (West

---

[3] The current version of the Act is codified at 49 U.S.C.A. § 13906 (West 1997 and Supp. 1998).

12

1994).[4]  Pursuant to this authority, the DOT and the ICC adopted regulations requiring interstate motor carriers to: (1) maintain a specified minimum amount of liability insurance, see 49 C.F.R. § 387.7(a)(1997) (stating the DOT's financial responsibility requirement), § 387.9(1997)(prescribing minimum levels of liability insurance), § 1043.1(a)(1)(1995) (stating the ICC's financial responsibility requirement), § 1043.2(b)(1995) (prescribing minimal levels of liability insurance); and (2) file proof of insurance with the ICC, see id. §§ 1043.1(a)(1)(1995), 1043.7(a)(3)(1995).  In a case such as this, the regulations specified that the required insurance was to be provided by a Form MCS 90 Endorsement, see 49 C.F.R. § 1043.7(a)(4)(1995), and the proof of insurance requirement was to be satisfied by the filing of a Form BMC 91X, see 49 C.F.R. § 1043(a)(3)(1995).

The coverage provided pursuant to an MCS 90 Endorsement takes the form of a suretyship, see Canal Ins. Co. v. Carolina Cas. Ins. Co., 59 F.3d 281, 283 (1st Cir. 1995) ("[W]e consider the [Form MCS-90 type] endorsement to be . . . a suretyship by the insurance carrier to protect the public . . ."), which requires the insurer to pay only final judgments assessed against

_____

[4]  The current version of this statute can be found at 49 U.S.C.A. § 13301(a) (West 1997).

13

the policyholder.  See John Deere Ins. Co. v. Truckin' U.S.A., 122 F.3d 270, 274-75 (5th Cir. 1997) (MCS-90 Endorsement does not obligate one insurer to indemnity another insurer which has settled a claim with injured party); Harco Nat'l Ins. Co. v. Bobac Trucking, Inc., 107 F.3d 733, 736 (9th Cir. 1997) (MCS-90 Endorsement does not require insurer to defend insured).  An insurer that pays a claim pursuant to an MCS 90 Endorsement also retains a right to recover any payment made on the claim from the insured.  See Harco Nat'l Ins. Co., 107 F.3d at 736.  Thus, an MCS 90 Endorsement does not obligate an insurer to either defend or indemnify its insured against a liability claim.  Instead, the insurer must pay any judgment awarded against the policyholder subject to a right of reimbursement.

(b)  Cancellation Requirements

Once a Form BMC 91X Certificate is filed with the ICC and an insurance policy is amended by the attachment of a Form MCS 90 Endorsement, the coverage provided pursuant to the endorsement remains in effect unless it is canceled in a manner prescribed by federal regulations.  The regulations permit an insurer to cancel an MCS-90 Endorsement by: (1) providing the insured with notice 35 days prior to cancellation, see 49 C.F.R. § 387.7(b)(1)(1997), and (2) providing the ICC with notice 30 days prior to cancella-

14

tion, see 49 C.F.R. § 1043.7(d)(1995). An MCS 90 Endorsement also will be canceled automatically notwithstanding the insurer's failure to comply with the endorsement's cancellation requirements if the policyholder purchases "replacement" insurance. See 49 C.F.R. § 387.7(c)(1997); 49 C.F.R. § 1043.7(e)(1995). In this case, New Hampshire Insurance argues that the coverage it provided to Textile Trucking pursuant to the MCS 90 Endorsement was terminated prior to the accident when the endorsement was effectively replaced by Northland's MCS 90 Endorsement on September 1, 1994.[5]

Textile Trucking and Northland both challenge New Hampshire Insurance's claim that the MCS 90 Endorsement was terminated by replacement. They argue that the Northland policy cannot qualify as a replacement policy because, unlike the New Hampshire policy it supplanted, the Northland policy did not cover the vehicle that was involved in the accident. This argument misses the point. The coverage provided by Northland's MCS 90 Endorsement

_____

[5] Northland's BMC 91X certificate was not received by the ICC until September 21, 1994, a few hours after the accident at issue occurred. Nevertheless, Northland's MCS 90 Endorsement qualifies as a replacement policy as of September 1, 1994 because its BMC 91X Certificate specified that the coverage provided pursuant to the endorsement became effective on that date. See 49 C.F.R. §§ 1043.7(e)(1995) (insurer's liability "shall be considered as having terminated the effective date of the replacement certificate of insurance") and 387.7(c)(1997)(same).

15

was identical to the coverage provided by the MCS 90 Endorsement attached to the New Hampshire Insurance policy.[6]  Both endorsements covered the vehicle that was involved in the accident.  See MCS-90 Endorsement (insurer must pay any final judgment against the insured within the endorsement's limits of liability "regardless of whether or not each motor vehicle is specifically described in the policy").  Under these circumstances, it is irrelevant that Northland's policy did not list the vehicle involved in the accident as a covered vehicle.  Accordingly, the MCS 90 Endorsement amending the Northland policy qualifies as a replacement policy and New Hampshire Insurance's coverage obligations pursuant to the endorsement were canceled on September 1, 1994, when the Northland policy and its endorsements became effective.

### 3.   State Filing Requirements

Textile Trucking and Northland next argue that the company is entitled to coverage from New Hampshire Insurance because of the Form E Certificates that New Hampshire Insurance filed on behalf of Textile Trucking in New Jersey, Massachusetts, and New Hampshire.  In responding to this argument, I first discuss the

---

[6]  As I explain below, Northland's policy was amended by the MCS 90 Endorsement even though the company inadvertently failed to attach the endorsement to the policy.

16

federal laws and regulations that gave rise to the Form E filing requirement. I then describe several recent changes to these requirements and turn to the merits of the claim.

(a) Form E Filing Requirement

Until January 1, 1994, federal law provided that an interstate motor carrier could not operate in a state that required motor carriers to file evidence of liability insurance coverage unless the carrier first filed a Form E Certificate of Insurance with the state's regulatory authorities. See 49 C.F.R. § 1023.51 (1992) (stating the filing requirement), § 1023.52 (1992) (requiring that certificate of insurance must be a Form E filing). By filing a Form E Certificate, an insurer certified that it had issued a policy of insurance to its insured that had been amended by a Form F Endorsement. See 49 C.F.R. § 1023.53 (1992) (endorsement required must be a Form F Endorsement). This endorsement obligated an insurer to provide the insurance required by the law of the state where the Form E filing was made subject to a right of reimbursement from the insured. Once a Form E Certificate was filed, the regulations stated that it could not be canceled without providing 30 days advance notice. See 49 C.F.R. §§ 1023.71 (1992)(specifiying that a Form K Notice of Cancellation was required to cancel a Form E filing).

17

(b)    Single State Registration System

In 1991, Congress passed the Intermodal Surface Transportation Efficiency Act which, among other things, directed the ICC to replace the existing multi-state registration system with a simplified single state registration system.  See Intermodal Transportation Efficiency Act of 1991, Pub. L. No. 102-240, § 4005 (effective Jan. 1, 1994).  Regulations implementing the new system went into effect on January 1, 1994.  See Single State Insurance Registration, 58 F.R. 28,932 (1993), codified at 49. C.F.R. §§ 1023 and 1162 (1994)).

The regulations implementing the single state registration system permit a motor carrier to satisfy the new registration requirements by registering in the state where its principal place of business is located, if that state is a participating state.[7]  See 49 C.F.R. § 1023.3 (1993).  Otherwise, the motor carrier must register in the participating state where it expects to  operate the greatest number of vehicles in the coming year. See id.  Proof of insurance under the new system is demonstrated by the filing of a Form BMC 91 or Form BMC 91X Certificate in the

---

[7]  States are not required to participate in the single state registration system.  Federal law, however, does not otherwise authorize states to impose insurance requirements on interstate motor carriers.

registration state.  See 49 C.F.R. §§ 1023.4(c)(2)(1993)
(requiring motor carrier to file proof of liability insurance
required by 49 C.F.R. § 1043); 1043.7(3)(1992) (specifying use of
Form BMC 91 and Form BMC 91X Certificates).  Because the new
single state registration system replaced the old multiple state
registration system, it eliminated any federal requirement that a
motor carrier file Form E Certificates.  42 U.S.C.A. § 11506(c)
(1)(A) (effective Jan. 1, 1994) (noting that under the new
system, a motor carrier will be required to "register annually
with only one State); Single State Insurance Registration, 58
F.R. 28,932 (1993), codified at 49. C.F.R. §§ 1023 and 1162
(1994)) (stating the commission's intent to replace the more
burdensome multi-state registration system, which required
individual Form E filings, with a more simplified system).

Massachusetts and New Hampshire participate in the single
state registration system but New Jersey does not.  Instead, New
Jersey requires intrastate motor carriers to file Form E
Certificates.  See N.J. Adm. Code Title 13 §§ 44D-1.1 (defining
"public mover"), 44D-4.2(b) (requiring public movers to file
proof of insurance).

(c) <u>Analysis of New Hampshire Insurance's Coverage
     Obligations Under the New Hampshire and
     Massachusetts Filings</u>

New Hampshire Insurance originally filed Form E Certificates
on behalf of Textile Trucking in Massachusetts, New Hampshire,
and New Jersey.  It canceled these filings several months  prior
to the September 21, 1994 accident because Textile failed to make
timely premium payments.  Although it reinstated the New Jersey
filing when Textile Trucking made the required premium payment,
it did not reinstate the Massachusetts and New Hampshire filings.
Based on this series of events, Textile Trucking argues that New
Hampshire Insurance remains obligated pursuant to the Form E
filings it made in Massachusetts and New Hampshire because the
insurer should not be allowed to benefit from its wrongful
failure to reinstate those filings after Textile remitted its
late premium payments.

Textile Trucking's argument is based on the incorrect
premise that New Hampshire Insurance erred in failing to
reinstate the Massachusetts and New Hampshire Form E filings.  By
the time Textile made its late premium payments, the multi-state
registration system under which the Massachusetts and New
Hampshire Form E filings were made had been replaced by the
single state registration system.  Because both Massachusetts and

20

New Hampshire elected to participate in that system, they no longer required motor carriers to file Form E Certificates. Instead, a motor carrier could demonstrate proof of insurance by filing a Form BMC 91 or Form BMC 91X Certificate in the motor carrier's home state.[8] Since Textile Trucking was not longer required to file Form E Certificates in either Massachusetts or New Hampshire, the insurer cannot be faulted for failing to reinstitute these filings.

(d)  Analysis of New Hampshire Insurance's Coverage Obligations Under the New Jersey Filing

Textile Trucking and Northland also argue that New Hampshire Insurance is obligated to cover the accident because it failed to cancel the New Jersey Form E filing prior to the accident.  I reject this argument because I conclude that this filing did not impose any obligation on New Hampshire Insurance to cover an accident that occurred outside New Jersey and involved parties with no connections to the state.

The Form E Certificate that New Hampshire Insurance filed in New Jersey provides that the company's insurance policy has been

---

[8]  Neither Textile Trucking nor Northland argues that New Hampshire Insurance owes any coverage obligation by virtue of the Form BMC 91X it filed when it registered in New Hampshire in accordance with the single state registration system.  Thus, I do not address the significance of that filing here.

21

amended by a Form F Endorsement "covering the obligations imposed upon such motor carrier by the provisions of the motor carrier law of the state . . . ." Accordingly, I look to New Jersey law to determine the scope of the coverage provided pursuant to the Form E Certificate and the Form F Endorsement.

New Jersey's motor carrier law requires only intrastate motor carriers to file proof of insurance with the state. See N.J. Adm. Code Title 13 §§44D-4.2(b)(requiring "public movers" to file proof of insurance), 44D-1.1 (limiting definition of "public mover" to carriers engaged in intrastate commerce); 44D-4.2(e)(1) (specifying proof of insurance must be demonstrated by a Form E filing). Although New Jersey law does not expressly limit the coverage that must be provided pursuant to the Form F Endorsement to accidents that occur within the state's borders, given the fact that the law applies only to intrastate motor carriers, that is its most plausible construction. Further, the more expansive interpretation proposed by Northland and Textile Trucking, which would extend the insurance requirement to accidents that occur anywhere in the United States regardless of whether the insured is a New Jersey motor carrier, would give the statute an extraterritorial impact that is inconsistent with the Constitution's Interstate Commerce Clause. See, e.g., Edgar v.

22

<u>Mitre Corp.</u>, 457 U.S. 624, 642 (1982) ("the commerce clause also precludes the application of a state statute to commerce that takes place wholly outside the state's borders, whether or not the commerce has effects within the state").  For these reasons, I decline to interpret New Jersey's motor carrier law to impose an insurance requirement on the out-of-state activities of an <u>interstate</u> motor carrier not based in New Jersey.[9]

## B.    Northland's Coverage Obligations

Textile Trucking offers three arguments as to why Northland owes it a coverage obligation.  First, it contends that the Northland policy's audit provision, which allows Northland to adjust the premium to account for undisclosed exposures, entitles Textile Trucking to coverage for the vehicle involved in the accident even though Textile did not originally list that vehicle on its policy application.  Second, it asserts that Northland is liable for certain alleged misrepresentations made by employees

---

[9]  Northland's reliance on <u>DeHart v. Liberty Mutual Ins.</u>, 1998 W.L. 834330 (Ga. 1998) is misplaced.  Unlike the present case, the coverage question at issue in <u>DeHart</u> arose in 1987, when federal law authorized states like New Jersey to impose Form E Certificate of Insurance requirements on interstate motor carriers.  <u>See</u> <u>supra</u> at pp. 17-19.  Moreover, <u>DeHart</u> involved an attempt to apply a Georgia proof of insurance requirement to the interstate activities of a Georgia motor carrier.  A state obviously has a far stronger interest in regulating the interstate activities of one of its own companies than it has in regulating the out-of-state activities of a foreign corporation.

23

of the Elliot Agency that caused Textile Trucking to mistakenly believe that it was covered under the New Hampshire Insurance policy until October 1, 1994.  Finally, it points to the fact that Northland neglected to attach the MCS 90 Endorsement to the policy and argues that, in such circumstances, Northland's filing of a BMC-91X certificate with the ICC obligated it to provide a defense and indemnification rather than the more limited suretyship coverage that ordinarily is provided pursuant to an MCS 90 Endorsement.  I address each argument in turn.

### 1.  The Audit Provision

The scope of the coverage provided by the Northland policy is described in Northland's "Truckers Coverage Form."  The pertinent section of this Form states that:

> We [Northland] will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance, or use of a <u>covered</u> "auto."
>
> We have the right and duty to defend any "suit" asking for such damages. . . .  However, we have no duty to defend "suits" for "bodily injury" or "property damage" . . . . <u>not covered</u> by this Coverage Form. . . .

Def. Northland Ex. C (Truckers Coverage Form, Section II)(Doc. 16)(emphasis added).

The term "covered auto" is defined in Section I of the Northland Truckers Coverage by reference to one of ten "covered

24

auto designation symbols" numbered 41-50.  <u>See</u> Def. Northland Ex. C.  The Northland policy insuring Textile Trucking specifically provides for a "46" covered auto designation.  Section 46 defines "covered autos" as:

> SPECIFICALLY DESCRIBED AUTOS.  Only those "autos" described in ITEM THREE of the Declarations for which a premium charge is shown.

<u>Id.</u>  An attached endorsement to the Northland policy, No. T-237, makes a clerical amendment to the definition of a section 46 "covered auto:"

> SPECIFICALLY DESCRIBED AUTOS.  Only those "autos" described in ITEM <u>FOUR</u> of the Declarations for which a premium change [sic] is shown.

<u>Id.</u> (emphasis added).  Inspection of Item Four of the Northland policy coverage declarations reveals that the Textile Trucking vehicle involved in the accident, a 1985 Mack Tractor identified by the ID number 1M2N17947FA001679, is not listed as a covered vehicle.

Textile Trucking attempts to overcome its failure to seek coverage for the vehicle involved in the accident by relying on the policy's audit provision.  This provision states:

> <u>Premium Audit</u>
> a.  The estimated premium for this coverage form is based on the exposures you told us you had when the policy began.  We will compute the final premium due and the first named insured will be billed for the balance,

25

if any . . . .

Although Textile Trucking cites no authority to support its position, it argues that the audit provision somehow obligates Northland to cover the vehicle involved in the accident even though it was not listed as a "covered auto."  This argument is unconvincing.  If the policy's audit provision were to be interpreted as Textile Trucking suggests, it would eviscerate the policy's requirement that the policyholder list the vehicles for which it seeks coverage.  Accordingly, I decline Textile Trucking's request to give the policy's audit provision such an interpretation.

### 2. Northland's Coverage Obligations Arising From Representations Made by Employees of the Elliot Agency

Textile Trucking next argues that Northland is liable for certain allegedly negligent misrepresentations and other errors made by representatives of the Elliot Agency.  This argument lacks merit for the simple reason that Textile Trucking has failed to produce sufficient evidence to support its assertion that any employees of the Elliot Agency were acting as Northland's agents when they allegedly made the misrepresentations on which the claim is based.  Instead, the record in this case clearly demonstrates that the Elliot Agency was acting as

Textile's agent when it procured insurance from Northland. See, e.g., Aff. of Lenehan (attached to Doc. 23); Dep. of St. Germain (appended to Docs 62, 63 at pp. 23-27); Dep. of Desaulniers (appended to Docs. 62, 63 at pp. 9, 12, 17, 26, 28). While the Elliot Agency could conceivably be liable to Textile Trucking for its alleged misrepresentations, the company has no basis for attributing that liability to Northland.

### 3. Northland's Coverage Obligations Based on the Form BMC 91X Certificate

Textile Trucking's final argument is that Northland is liable because it filed a Form BMC 91X Certificate with the ICC and thus agreed to cover all of Textile Trucking's vehicles, regardless of whether they were listed as covered autos in the Northland policy. Northland concedes that it is obligated to provide the coverage mandated by the Form MCS 90 Endorsement which it agreed to add to the policy when it filed the Form BMC 91X Certificate with the ICC. It insists, however, that it is liable only as a surety and that its liability is subject to a right of reimbursement from Textile Trucking. Textile Trucking responds by claiming that since Northland neglected to attach the Form MCS 90 Endorsement to the policy, it is obligated to treat the vehicle involved in the accident as if it had been listed as a covered auto and provide Textile Trucking with the full

27

coverage available to it under the policy rather than the far more limited coverage available under the MCS 90 Endorsement.

This argument is also unpersuasive. Northland's filing of a Form BMC 91X certificate with the ICC certifies that the motor carrier's liability insurance policy has been amended by the addition of, in this case, a Form MCS 90. See Form BMC 91X Certificate. It is the MCS 90 Endorsement that, by its terms, obligates the user to cover all of the insured's motor vehicles "regardless of whether or not each motor vehicle is specifically described in the policy . . ." 49 C.F.R. § 387.15 (1997) (Form MCS 90). Accordingly, to the extent that Northland is liable in this case by virtue of having filed a Form BMC 91X Certificate with the ICC, its liability arises from the fact that by making this filing, its policy is deemed to have been amended to include an MCS 90 Endorsement.

Northland concedes, as it must, that it is obligated to cover the accident based upon the MCS 90 Endorsement. This obligation, however, takes the form of a suretyship and imposes no duty to indemnify or provide a defense to Textile Trucking, see John Deere Ins. Co., 122 F.3d at 274-75; Harco Nat'l Ins. Co., 107 F.3d at 736, or the operators of its vehicles, see Radman v. Jones Motor Co., 914 F. Supp. 1193, 1193 (W.D. Pa.

28

1996).[10]  Moreover, this obligation is subject to the insurer's right to seek reimbursement from the insured.  See <u>Harco Nat'l Ins. Co.</u>, 107 F.3d at 736.

Because Northland concedes that its policy was constructively amended to include a Form MCS-90 Endorsement, I hold that Northland is obliged, subject to the limits specified in the MCS 90 Endorsement, to pay any final judgment recovered against Textile Trucking arising from the underlying lawsuit.  Northland is not obliged, however, to indemnify or provide a defense to either Textile Trucking or Kaar with respect to the underlying lawsuit.  Instead, Northland is entitled to recover any payments made pursuant to the endorsement from Textile Trucking.


## IV.  <u>CONCLUSION</u>

For the foregoing reasons, New Hampshire Insurance's motion for summary judgment, alleging (1) its underlying insurance policy was canceled by replacement on September 1, 1994, and (2) asserting the absence of any continuing obligation on the part of New Hampshire Insurance pursuant to Form E filings made by the

_____

[10]  The conclusory assertions to the contrary made by Textile Trucking's "expert" on the issues of law do not give rise to the kind of factual dispute that would prevent me from granting summary judgment on this issue.

insurer in Massachusetts, New Hampshire, and New Jersey, is granted.

Northland's motion for summary judgment is granted as to Northland's claims that (1) it has no obligation to indemnify Textile Trucking for the accident involving a vehicle unlisted on its policy, and (2) because the Elliot Agency was not acting as Northland's agent, its statements and/or representations cannot bind Northland. Northland's motion is denied as to its claims that New Hampshire Insurance had a duty to act as a surety arising from uncanceled or improperly canceled Form E filings in Massachusetts, New Hampshire, or New Jersey.

Textile Trucking's motion for summary judgment is denied except insofar as Textile claims that Northland owes Textile Trucking a suretyship obligation subject to a right of reimbursement.

The result of these motions is that Northland owes Textile Trucking a suretyship obligation to pay any final judgment arising from the accident involving the Textile Trucking vehicle, within the limits specified by the Form MCS-90 Endorsement, subject to a right of reimbursement from Textile Trucking. New Hampshire Insurance is released from all claims of liability

30

arising out of any such judgment.[11]

     SO ORDERED.


                                     _____
                                     Paul Barbadoro
                                     Chief Judge

February    , 1999


cc:  Russell Hilliard, Esq.
     Roger Phillips, Esq.
     Andrew Dunn, Esq.
     Ira Lipsis, Esq.
     R. Matthew Cairns, Esq.

---

[11] Northland also sued the Elliot Agency seeking reimbursement for any liability it might have based upon any statements or actions by any employees of that agency. This claim appears to be moot in light of my ruling that Northland's coverage obligation is limited to the obligation it assumed pursuant to the policy's Form MCS 90 Endorsement. Accordingly, as all other claims in the case have been resolved, I will direct the clerk to enter judgment in accordance with this order and my order of March 5, 1998 unless any party objects on or before March 15, 1999.